**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STEPHANIE BURES, for herself and on behalf of her minor children, TERRANCE JACKSON, JR., and SAMARI BOSWELL; KIQIANA JACKSON; JESSICA JACKSON: and ARKEYA BLANCHARD, ) ) ) ) ) ) | |
| Plaintiffs, ) | No. 19-cv-02040 |
| v. ) ) | Judge Matthew F. Kennelly |
| THE CITY OF CHICAGO; Chicago police officers JERALD WILLIAMS (star #3317); JOSEPH BISZEWSKI (#12014); LIEUTENANT JAMES D. CASCONE (#560); ALFREDO CASTRO (#9609); FERNANDEZ DELGADO; (#6261); MATT DERCOLA (#15740); SAMUEL FLORES (#17305); ZACHARY GAMMONLEY (#15808); F. GARIBAY (#16358); SERGEANT GUNNEL (#2020); KEVIN MCKENDRY (#11564); PAUL MIESZALA (#15179); WASHINGTON MINA (#18599); JONATHAN MORLOCK (#15358); NICHOLAS NESIS (#3329); CHRISTOPHER PASCAL (#11996); VINCENTE PAREDES (#16960); JON PEULECKE (#17167); and PEDRO VIANNA (#3145), ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Maria Valdez |
| Defendants. ) ) | Jury Demanded |

**AMENDED COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld,

Jr., LLC, bring this action against defendant City of Chicago pursuant to 42 U. S. C. § 1983 for

traumatizing two young children and violating their Constitutional rights and those of their

mother, aunts and other close relatives and friends, and state as follows:

2.      On Sunday, February 10, 2019, family and friends were celebrating the birthday party of 4-year-old Terrence Jackson ("TJ") when 25 Chicago police officers, who were not wearing body cameras, arrived at the residence to execute a search warrant for a suspect who had not lived there in approximately five years.

3.      During the raid, officers repeatedly pointed and held guns at close range directly at TJ and his 7-year-old sister, Samari, as well as at their family and friends in the children's presence.  Officers' guns were loaded, and their fingers were on the triggers.  The children were afraid that they and their families were going to be shot.

4.      Officers also handcuffed some of the children's relatives, including TJ's father and an aunt, shouted profanity and insults at the family, and used abusive and contemptuous language, all within the direct sight and hearing of the children.  Neither the children nor any of the adults posed any apparent, actual or possible threat whatsoever to the officers.  No one refused to follow officer instructions.

5.      During the ensuing search, officers smashed TJ's birthday cake, damaged his presents; tossed, damaged or destroyed bedrooms and property belonging to family members; and poured out liquids over their belongings to humiliate them.  TJ's family did not get to sing happy birthday to him or cut and eat his birthday cake.

6.      Officers did not arrest or charge anyone.  They did not find illegal drugs referenced in the warrant.  After learning that the target of the search warrant did not live at the residence, officers left, cynically laughing.  They did not apologize for terrorizing the children or the family or explain why they had been there.

7.      Chicago police terrorized an innocent family for no reason.  Their actions toward and in the presence of the children and their family were not just the product of an

avoidable mistake that was the result of sloppy police work, but they also displayed force that was excessive, unnecessary, unreasonable, and without lawful justification. And it was not an isolated incident: it was undertaken pursuant to the City of Chicago's systemic, unofficial policy of failing to protect young children from unnecessary uses of police force, as set forth below.

8.     TJ and Samari now suffer serious, emotional and psychological distress and injury, including symptoms of Post-Traumatic Stress Disorder, as a direct result of their exposure to defendant officers' unnecessary and terrifying conduct. Their deep distress and related symptoms constitute scars on their young psyches that may never fully heal.

## JURISDICTION AND VENUE

9.     This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978). This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction of plaintiffs' state law claims.

10.     Venue is proper pursuant to 28 U. S. C. § 1391(b). The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

11.     At the time of all relevant events, plaintiff Terrance Jackson, Jr. ("TJ") was a four-year-old boy residing with his mother, father, and sister at 7701 S. Paulina Street, basement unit, in Chicago, Illinois. On February 10, 2019, TJ was a preschooler.

12.     At the time of all relevant events, plaintiff Samari Boswell ("Samari") was a seven-year-old girl residing with her mother, father and brother (TJ) at 7701 S. Paulina Street, basement unit, in Chicago, Illinois. On February 10, 2019, Samari was in the 2nd grade.

13.     Plaintiff Stephanie Bures ("Ms. Bures") is TJ and Samari's natural mother. At the time of all relevant events, Ms. Bures resided with her children and TJ's father at 7701 S. Paulina Street, basement unit, in Chicago, Illinois.

14.     Plaintiff Kiqiana Jackson ("K. Jackson") is one of TJ and Mari's paternal aunts.  At the time of all relevant events, Ms. K. Jackson resided at 9728 S. Yale in Chicago, Illinois.

15.     Jessica Jackson ("J. Jackson") is another of TJ and Mari's paternal aunts. At the time of all relevant events, Ms. J. Jackson resided at 7701 S. Paulina Street in Chicago, Illinois.

16.     Plaintiff Arkeya Blanchard is a friend of Kiqiana Jackson and her family, including TJ and Samari.  At the time of all relevant events, Ms. Blanchard resided at 7553 S. Wood in Chicago, Illinois.

17.     At the time of all relevant events, Ms. K. Jackson and Ms. Blanchard worked full-time as assistant classroom teachers for disabled children.  Ms. J. Jackson worked full-time-plus in a restaurant.  Ms. Bures worked part-time as a cashier.

18.     Plaintiffs and their children are African-American.

19.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

20.     At the time of all relevant events, defendant Jerald Williams (star #3317) was a Chicago police officer assigned to the Area South Gang Enforcement Unit, based in the Second Police District.  He was the affiant for the complaint for search warrant.  He and at least the following other defendant Chicago police officers, also believed to be members of this gang unit, participated in obtaining and/or executing the search warrant for 7701 S. Paulina:  Joseph

Biszewski (#12014); Fernandez Delgado (#6261); Matt Dercola (#15740); Zachary Gammonley (#15808); Sergeant Gunnel (#2020); Kevin McKendry (#11564); Paul Mieszala (#15179); Washington Mina (#18599); Jonathan Morlock (#15358); Nicholas Nesis (#3329); Christopher Pascal (#11996); and Pedro Vianna (#3145). Approximately 25 officers in total participated onsite in executing the search warrant.

21.     Defendant Chicago police officer Lieutenant James D. Cascone (star #560) approved officer Williams' search warrant, both pre- and post-execution, and may have supervised the overall operation.

22.     Defendant Chicago police officer Sergeant Gunnel (star #2020) was also the supervising officer of the Area South Gang Enforcement Unit and the supervising officer on the scene at the residence in charge of the raid.

23.     Defendant officers Jon Peulecke (star #17167), Alfredo Castro (#9609), Samuel Flores (#17305), F. Garibay (#16358), and Vincente Paredes (#16960) also participated in the execution of the search warrant.

24.     On information and belief, all of the other officers who participated in the execution of the search warrant on February 10, 2019, were Caucasian males.

25.     When Chicago police officers executed the search warrant at 7701 S. Paulina on February 10, 2019, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

***Overview:  CPD's <u>M. O.</u> is to Unnecessarily Use Force Against
and in the Presence of Young Children***

26. Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of unnecessarily using force against or in the presence of children (ages 0-14), especially children of color, which traumatizes them.

27. The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using less-than-lethal, excessive force against children for non-criminal conduct. (U. S. Dept. of Justice *Investigation of the Chicago Police Department*, Civil Rights Division and U. S. Attorney's Office for the Northern District of Illinois, Jan. 13, 2017, pp. 34-35).

28. The 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained substantially similar conclusions and recommended a number of specific police reforms to improve police-youth interactions and the policing of youth.

29. None of the reforms that CPD has implemented or announced to date purport to remedy or address the identified problems.

30. The federal consent decree agreed to by the City of Chicago and the State of Illinois in 2018 does not address them.

31. CPD's recently revised use of force policy, GO3-02, does not expressly require officers to avoid using unnecessary force against or in the presence of young children whenever possible and does not require officers to use a trauma-informed approach to the use of force in situations where some police force is necessary. CPD's search warrant policy, SO9-14, was not revised to incorporate these or similar changes.

32. Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore, San Francisco and others - CPD still does not provide any training or supervision to officers concerning youth brain development or the

importance of preventing trauma to young children by utilizing a trauma-sensitive approach to the use-of-force in situations where children are present.

33.     The connection between trauma and child development and between trauma and mental and physical health is well-established.

34.     It is also well-known that many poor children of color have already been subjected to multiple traumas in the neighborhoods and circumstances in which they live and, therefore, police should be mindful that their use of unnecessary force against or in the presence of poor, children of color would compound and deepen their trauma.

## FACTS RELATING TO ALL COUNTS

### *Chicago Police Obtain a Search Warrant for Someone Who Had Not Lived at the Residence For Five Years*

35.     At approximately 4:11PM on February 9, 2019, officer Williams swore out and obtained a search warrant authorizing a search of "Philip C. Baylis" and the premises at "7701 S. Paulina Street… (basement unit), Chicago, Cook County, IL."  The warrant also authorized the seizure of Ecstasy, paraphernalia, cash, records of illegal drug transactions, and residency documents.  It also indicated Mr. Baylis was a gang member.

36.     The complaint for search warrant inaccurately stated, based on information from a John Doe confidential informant, who is an admitted narcotics user with pending criminal charges, that Mr. Baylis resides in the basement unit at 7701 S. Paulina.

37.     In fact, on February 9, 2019, Mr. Baylis did not reside at 7701 S. Paulina and had not lived there in approximately 5 years.  He moved out in approximately March, 2014, and Jessica Jackson moved into the room where he had lived.  She has occupied that room ever since.

38.     On information and belief, Mr. Baylis has had no connection to 7701 S. Paulina since he moved out in 2014.  He does not receive mail or store belongings there.  He does not have a key.  As a distant relative, he occasionally visits.  He was not present at TJ's birthday party on February 10, 2019 and had not been invited.

39.     A simple LexisNexis person search revealed Mr. Baylis' most current address immediately as 200 E. 83rd Street in Chicago.  But defendant officers used the address given them by the John Doe informant, without properly verifying this address through other sources.

40.     The facts that a Chicago police officer alleges in a complaint for search warrant are required to be "credible and reliable."  (CPD SO4-19, VI.B.a.).  To this end, a Chicago police officer swearing out a search warrant under oath before a judge is required to "thoroughly conduct[]" the "investigation leading up to the need for a search warrant."  (CPD SO4-19).

41.     Crucially, the affiant of a complaint for search warrant is required to independently investigate and verify the information provided by a John Doe confidential informant, including information about where the intended target resided.

42.     In other words, as the sworn applicant for the warrant, officer Williams had a duty to discover, diligently and in good faith, and disclose to the issuing warrant judge whether he had identified the correct apartment or place to be searched and not the residence of an innocent third party.

43.     In direct violation of CPD policy, officer Williams, Lieutenant Cascone and other officers involved in obtaining or approving the search warrant for 7701 S. Paulina performed no independent investigation or surveillance to verify that the John Doe confidential

informant had provided current or accurate information regarding where Mr. Baylis resided or could be found.

44.　　Defendants could have made any of a number of simple inquiries.　As a Chicago police officer, officer Williams had multiple sources of information available to him. He could have contacted the building's owner.　He could have contacted a utility company supplying energy to the building or basement unit.　He could have utilized CPD's database, Accurint, which assists officers in identifying persons residing at a given address.　He could have run a person search on LexisNexis, using Mr. Baylis' date of birth and last known address.

45.　　But officer Williams failed to conduct any investigation or verification, as required by SO4-19.　He simply trusted what the John Doe told him about where Baylis lived.

46.　　Consequently, in his complaint for search warrant Williams provided the court with an incorrect or obsolete address, 7701 S. Paulina.　Officers did not have probable cause to believe that Baylis lived there and, therefore, to enter and conduct a search at that address.

47.　　Because officers failed in their official duty to independently investigate and verify the particular place to be searched, theirs was not a good faith error.

48.　　Similarly, Lieutenant Cascone simply gave rubberstamp approval to officer William's application for search warrant, without taking any steps to ensure that officer Williams and other officers had performed the due diligence required by CPD Special Order S04-19.　Taking such vital steps was something he was officially required to do.

49.　　On February 9 and 10, 2019, defendant officers reasonably knew or should have known that the intended target of warrant did not reside at 7701 S. Paulina.

50.     Moreover, as is customary in Chicago, the defendant officers, in the course of obtaining and executing the search warrant, took no steps to first determine whether children resided in the basement unit or in the house, to avoid entering at times when children were likely to be present, or to deescalate their tactics when they unexpectedly encountered young children at 7701 S. Paulina.  As a result, officers injured TJ and Samari.

### *Officers Point Guns at Children, Handcuff their Adult Relatives in Front of Them, Insult Family Members, and Destroy a Four-Year Old's Birthday Cake and Party*

51.     On Sunday evening, February 10, 2019, family and friends were gathered at 7701 S. Paulina in Chicago to celebrate the birthday of 4-year-old TJ and that of his aunt J. Jackson.  The two have the same birthday, February 10.

52.     At 7:15PM, approximately 14 adults and children were gathered in the living room of the basement unit.  The men were playing dominoes and cards.  The women were casually talking with each other.  There were four young children present - ages 4, 5, 7 and 11. They were playing Uno, Duck Goose, and other games, and were dancing to a musical video game.

53.     The family had not yet sung happy birthday to TJ or cut the birthday cake, which sat in an unopened box in the center of the dining table.

54.     All of sudden, the back door of the house opened loudly and hit the wall (the door was unlocked), and there were booming steps on the few stairs leading down to the basement, then shouts, as approximately 20, plain-clothed Chicago police officers, guns drawn and carrying tools (crowbar, sledge hammer, battering ram, shield, and camera), flooded into the basement.

55.     On information and belief, most or all of the defendant officers who entered the residence were not wearing or did not turn on body worn cameras.

56.     Before and as they entered, officers did not "knock and announce" themselves, even though the search warrant was not a no-knock warrant.

57.     As they entered the basement and saw plaintiffs, officers shouted, "GET YOUR F---ING HANDS UP!" and "WE ARE DOING A F---ING RAID!"  The officers did not identify themselves as police officers.

58.     When the family looked and saw the officers from living room, there were many men in plain clothes rushing towards them from the back of the basement, all of them with pistols drawn and pointed directly at them.  Every officer they saw had a handgun drawn and pointed at them.  Some were holding and aiming their pistols with two hands.  The officers stopped their forward movement about two or three steps from the children and their families, their guns pointed directly at them.

59.     The children began screaming and crying at the sight.  When K. Jackson saw the men pointing guns at her family and saw the children reacting, she instinctively stretched out her arms in front of the children, who were standing next to her at that moment, in order to shield them from gunfire.

60.     Hysterical and afraid, in this moment Samari thought the police were going to shoot at her and her brother.  At a later point, she thought she was going to go to "kid jail."

61.     In shock and still not knowing what was happening, K. Jackson and others asked, "What is going on?  Who are you and why are you here?"  One officer responded, "SHUT THE F--- UP!  IT'S A RAID.  PUT YOUR F---ING HANDS UP!"

62.     Another officer said, "We have a warrant."

11

63. When Ms. Jackson heard them say they had a warrant, she though the men might be police officers, and she asked them to show it to her. They said they would show it, but they didn't.

64. When Ms. Jackson pointed out that the kids were screaming and crying, an officer replied, "I DON'T GIVE A F--- THAT THE KIDS ARE CRYING; WE STILL HAVE TO SEARCH!"

65. When Ms. Jackson asked again to see the warrant, an officer responded "SHUT THE F--- UP. WE'LL GIVE YOU THE F---ING WARRANT WHEN WE GET READY TO GIVE YOU THE F---ING WARRANT. ARE YOU F---ING STUPID? WE SAID WE'RE GOING TO SHOW IT!"

66. Officers did not show the warrant at any time, except later in one moment when an officer rudely waved it in the face of T. Jackson, Sr., saying "THIS IS FOR YOU!" before taking it away again. This made it impossible to read.

67. During the 45-minute raid, Ms. Jackson asked at least 20 times in earnest to see the search warrant. After officers had tossed and destroyed the basement, searched all the rooms, and just before they left, they put a copy of the search warrant on the food table in the living room.

68. Because Ms. Jackson kept asking to see the warrant when officers entered and because she reached for her cell phone (which lay on a nearby speaker) and said she was going to record, an officer confiscated her phone and placed her in handcuffs as she was still holding onto the children. The officer kept telling her, "SHUT THE F--- UP!"

69.     After he handcuffed her, the officer searched her phone to make sure she did not record anything.  He then walked her outside and made her stand in the backyard in tears in the cold without a coat for approximately 20 minutes.  It was 23 degrees that evening.

70.     As the officer was pulling K. Jackson along by the handcuffs towards the back door, he intentionally stuck his foot out in front of her to trip her.  She asked him why he was acting that way.  His response was, "WALK THE F--- UP!"

71.     As Ms. Jackson was being pulled outside, Ms. Bures returned from the store, having made a quick trip for ice cream, utensils and other party supplies.  Officers detained her at the threshold of the basement for approximately 30 minutes before she was allowed to be with her children.  Officers took and ran her ID.  An officer started to ask her how long she had lived at 7701 S. Paulina, then cut it short and said, "YOU KNOW WHAT, JUST GO F---ING UPSTAIRS!"

72.     At about the same time, another officer placed T. Jackson, Sr., in handcuffs in front of his children when he told officers that he lived in the basement unit.

### *Officers Spitefully Search and Damage the Family's Possessions and Self-Worth*

73.     Officers had all of the adults present at the party place their phones, coats, purses and bags along a wall in the basement, then they patted down and/or fully searched them.  Male officers patted down females.  They searched through the men's pockets.

74.     Once officers had patted the adults down, they ordered all of the adults to sit along a wall in the basement, saying at one point, "OK.  I'M NOT SAYING IT AGAIN. EVERYBODY MOVE TO THE NEXT F---ING ROOM!"  They questioned the adults, asking if they lived in the basement, and "ran" all of their IDs through a database.

75. Police did not ever return Ms. Bures' ID; when she asked for it back as officers were leaving, the officer who had taken it simply laughed and walked off.

76. Officers knew within minutes after entering that Philip Baylis was not present. None of the adults at the birthday party fit the search warrant's description (or the mug shot of) Philip Baylis. None of them had long braided hair, long dreadlocks, and a light beard. There were no matches.

77. Officers searched all of adults' items that had been placed along the wall, then began violently searching the basement unit. They tossed and destroyed all of the rooms, took a door off the hinges, pried open wall panels with a crowbar, and broke both, front double doors to the house.

78. Ms. Bures, Terrance Jackson, Sr., and TJ and Samari lived in one of the basement bedrooms, and Jessica Jackson lived in the other. In these bedrooms, officers pulled clothes and other items out of drawers and plastic storage containers and threw them around, and broke drawers and other furniture. They flipped mattresses over and threw J. Jackson's flat-screen TV into the floor, breaking it.

79. Officers spitefully poured a new, unopened bottle of vodka, a birthday gift to J. Jackson, all over her flipped mattress and clothes strewn over the mattress.

80. In the children's bedroom, officers poured hydrogen peroxide over the flipped mattress and clothes that they had strewn around the room, dousing new clothes that were birthday gifts to TJ that day. Officers kicked around another of TJ's birthday gifts, a bowling set.

81. Worst of all, Chicago police officers knocked TJ's birthday cake off the table and onto the floor in a corner of the basement. When plaintiffs found it, the cake was

flipped over, the box top had been smashed into the cake so that the frosting stuck to top, the sides of the cake were smashed in, and the number "4" candle had been hastily shoved into the middle of the damaged cake.  This was a cruel, dehumanizing joke on a four-year-old's ruined birthday party.

82.     Eventually, two officers took the children upstairs to the ground floor but not before they had been exposed to officers' worst actions and words.  All of the children saw police handcuff TJ's father and his cousin, Kiqiana.  As officers began to search, the children saw them throw the family's possessions around and trash their bedrooms; and they saw the condition of the basement after the search.

83.     At his 2019 birthday party, the family never got to sing happy birthday to TJ, who never got to have cake and presents.

84.     The children heard the way police officers spoke to their parents and other family members.  They heard Chicago police officers direct foul, demeaning and insulting language at their family members, language that delivered a clear message to the children that officers not only did not respect for them but thought that they were enemies, criminals, garbage. And four-year-old TJ inevitably found out that officers ruined his birthday cake.

85.     Because of the way the officers spoke to the family, K. Jackson at on one point felt compelled to tell them that she and other family members had jobs and worked for a living.  She told them she was a teacher of disabled children.  In response, an officer said, "I FEEL SORRY FOR THE KIDS IF YOU'RE TEACHING THEM."

86.     Plaintiffs did not see or hear bodycams on the officers.  Most officers' badges or badge numbers were covered up by sweatshirts or other clothing.   Most of the officers refused to give their names and badge numbers.  Some lied, claiming all of their names and

badge numbers would be on the search warrant when they leave a copy. When one of the adults asked which district the officers were from, an officer replied sarcastically, "TRY SKOKIE!"

87. Once the minor children were upstairs, officers (unlawfully) questioned them outside of the presence of their parents and without their permission, asking questions like "Why are you here?" "Who do you belong to?" and "What are you doing?"

88. Near the end of officers' search of the basement, a family member overheard one officer say to another officer, "Did you find Philly?" The family, who still had not seen the warrant with Baylis' name on it, then realized that the officers were looking for Philip Baylis and told them directly, "Philip Baylis doesn't live here." The officers repeated this statement sarcastically to each other, laughing, then they promptly left.

89. Officers did not arrest or charge anyone. They did not find any Ecstasy, related paraphernalia, or cash.

90. Officers never explained or apologized to the children or their family; they just laughed cynically as they left. They were sarcastic, rude, disrespectful, and cocky. They were at plaintiffs' residence for approximately 40-45 minutes in total.

### Officers' Uses of Force Against TJ and Samari and Against Their Family in their Presence Was Totally Unnecessary

91. Plaintiffs, including TJ and Samari, presented absolutely no threat, real or apparent, to the police officers entering into and searching their home.

92. Even though they presented no threat, officers repeatedly pointed their guns at them, and other officers did not ask those pointing guns at the children to stop doing it.

93. Ms. K. Jackson, Ms. Blanchard and other family members present at TJ's birthday party when defendant officers entered presented absolutely no threat, real or apparent, to officers.

16

94.     Even though they presented no threat, officers repeatedly pointed guns at them and handcuffed Ms. K Jackson and Mr. Jackson in front of the children, and other officers did not ask their fellow officers to stop pointing guns them or remove the handcuffs.

95.     Moreover, plaintiffs posed no threat to officers after they discovered that no one who looked like the intended target of the warrant was in sight.

96.     Plaintiffs have been harmed by officers' unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and destruction of property.

### Officers' Unnecessary Uses of Force Traumatized TJ and Samari

97.     Chicago police officers' terrorizing conduct toward TJ and Samari and toward their family in the children's presence caused TJ and Samari immediate, severe and lasting emotional and psychological distress and injury.

98.     In addition to witnessing uses of force and threats of imminent violence against themselves, their father and other relatives and friends, the children were also subject to officers shouting and cursing commands and to adults' understandable distress. This made for one, big, fast, chaotic, unnecessary scene of terror.

99.     Prior to February 10, 2018, TJ and Samari were happy, healthy children in a close, loving family. Prior to this date, they had suffered no emotional or psychological trauma of any kind in their lives. That changed on February 10, 2018 with defendants' actions.

100.    Throughout their encounter with police, TJ and Samari were terrified, crying, and screaming hysterically. Based upon what she witnessed, Samari believed officers were going to shoot and kill her and her brother.

101.    TJ was also sad and started crying when his mother told him the police messed up his birthday cake.

102.     Ever since the incident, TJ and Samari have continued to re-live, in various ways, how terrified they were that day.  TJ is now angry.  He says police pointed guns at him, and he mimics or imitates the police pointing guns at him.  He now says, "I don't like police."  He has trouble calming down.  His mother has to give him baths to help calm him.  He does not want to go to bed or sleep at bedtime.

103.     Samari is still in shock.  She is now sad as well.  She has nightmares about angry police officers coming into her house with guns and knives.  She is especially scared at night.  She thinks about what happened before she goes to bed and in the middle of the night when she wakes up.

104.     Whenever Samari sees police officers, she feels scared and starts crying.  She now expresses hate for police officers.  Her parents taught she and TJ to respect and admire professionals, including police officers.  Samari has had "officer friendly" come to her classroom at school.  Until this incident, she believed that police officers were good.

105.     Both children are having difficulty sleeping.  They wake up in the middle of the night screaming and reaching out for their mother.

106.     The kids believe that Chicago police were at their home to hurt them.

107.     TJ and Samari now continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

108.     On information and belief, both children have, or have many of the symptoms of, severe Post-Traumatic Stress Disorder.

109.     As a direct result of officers' conduct, both children are now being medically assessed for trauma inflicted by the Chicago police.

110.    On information and belief, both now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing display of unnecessary force.

111.    The children's adult family members are also suffering mental distress as a result of officers' conduct.

112.    Before the incident, their mother Ms. Bures respected the police.  Now, she believes they are ruthless and disgusting.  To her, it felt like they were trying to destroy her family as human beings.

113.    Ms. Jackson had to call off work on February 11, 2019 because the officers made her feel like nothing, like garbage, like she was less than human.  To her, it seemed that everything the officers did was calculated to hurt the kids.  She could not sleep for several days.  She now has bad dreams.  She still wakes up in the middle of the night and cannot go back to sleep.

114.    Officers' shocking actions of repeatedly pointing and training loaded guns at close range on young children, their father, and close relatives, and handcuffing their father and aunt in their presence, constituted serious abuses of power and authority.

115.    Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards *four- and seven-year-old children.*  The children's sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

116.    Officers' conduct was undertaken pursuant to and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer

use of excessive force that includes the use of unnecessary force against and/or in the presence of children, especially minority children.

**COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM**
**AGAINST THE CITY OF CHICAGO**
**(Minor Plaintiffs Terrance Jackson, Jr., and Samari Boswell only)**

117.    Plaintiffs Terrance Jackson, Jr., and Samari Boswell re-allege all paragraphs 1-116 above and incorporate them into this count, including the *Monell*-related allegations of paragraphs 26-34.  They assert this claim against defendant City of Chicago.

118.    Defendant officers' use of excessive force against and in the presence of TJ and Samari was directly and proximately caused by one or more of the following three, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, *de facto* policies, widespread practices, and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against children (ages 0-14); 2) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against children; and 3) an absence of official policy and training to avoid the unnecessary or excessive use of force against and in the presence of children.  Each of these policies existed for more than six years prior to February 10, 2019 ("the *Monell* period").

119.    First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force involving children (ages 0-14), including unnecessary force directed at children and/or at adult family members in the presence of children.

120.    This set of City's widespread practices or customs directly encouraged, authorized and caused officers' conduct toward TJ and Samari.  The City's historical failure, leading up to February 10, 2019, to properly intervene in, investigate and discipline officer

excessive force, especially excessive force against or in the presence of young children, caused officers to act without appropriate restraints in the presence of TJ and Samari.

121.     This was facilitated by unjustified exemptions from the bodycam mandate and a complete lack of official disciplinary consequences for officers who do not wear or do not turn on their bodycams.

122.     The City was on notice of each of these failures of official policy from the specific conclusions reached by and the data contained in the 2017 U. S. Department of Justice investigative and the PATF reports (citations above).

123.     Second, defendant officers' conduct towards and in the presence of TJ and Samari was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against children or against their adult relatives in the children's presence whenever possible.

124.     Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of unnecessary use of force against and/or in the presence of children, a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights. City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to TJ and Samari.   Specifically, this lack of official policies, training, and reforms includes:

a.     The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against or in the

presence of children, or to use a trauma-informed approach to the use of force in situations where children are present, and some force may necessary;

b.      CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or requirement that officers should avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present and some force may be necessary;

c.      CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether children reside in the residence, (b) to avoid entry and search at times when children are likely to be present (ii) to de-escalate themselves or change tactics when they unexpectedly encounter young children, and/or (iii) to take other precautions to avoid traumatizing children, such as avoiding placing parents and grandparents in handcuffs in the children's presence;

d.      CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

e.      City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

125.     Third, the City's lack of official policies to protect children from unnecessary officer use of force, combined with its failure to hold accountable officers who use unnecessary force involving children, have resulted in a *de facto* City policy and practice of using unnecessary or unreasonable force against young children and/or in their presence, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF.  The excessive force used against or in the presence of TJ and Samari was an example of and the result of this *de facto* policy.

126.     Through their combined failures, before and after notice, to enact official policies that protect children from unnecessary force and to hold accountable officers who use excessive force against children, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA") or the Civilian Office of Police Accountability ("COPA").  These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of TJ and Samari, providing them a general license to use excessive force involving children whenever it suits them.

127.     Through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the Mayor, and the Chicago City Council – condoned, approved, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of young children.

128.     Additionally, CPD has a *de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable and unverified information, with the consequence that the overwhelming majority of warrants executed are "negative," i.e., they result in no arrest.  But they consistently result in excessive force, terror and lasting trauma to innocent residents, including young children.

129.     CPD fails to investigate, discipline and otherwise hold accountable officers who apply for and execute residential search warrants based on inaccurate, unreliable and unverified information.

130.     Nor does CPD audit, monitor or track residential search warrants in the aggregate, even on a sample basis, in order to identify police practice issues (such as whether officers are doing anything to verify the current or correct address for the target) and improve practices, including investigative and use of force practices, despite the fact that such measures could boost "positive" warrant results and inflict less trauma on innocent bystanders, including young children.

131.     During all times relevant to the incident involving Samari and TJ, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children.  Unjustified exemptions from the bodycam mandate and a complete lack of official discipline and accountability for officers who do not wear or do not turn on their bodycams reinforce the code of silence.  Defendant officers' conduct toward TJ and Samari, including their failure to intervene and failure to report the actions of their colleagues, was the direct result of

the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

132.     By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of unnecessary force against and/or in the presence of young children, defendant City of Chicago has manifested and manifests deliberate indifference to the deprivation of TJ and Samari's constitutional rights.

133.     One or more of these three polices, practices and customs collectively, directly and proximately caused the violations of TJ and Samari's constitutional rights set forth above and below and the resulting injuries, such that the City of Chicago is liable for officers' use of excessive force against them and/or in their presence.

### The City of Chicago's _De Facto_ Policies Resulted in Violations of TJ and Samari's Constitutional Right to be Free of Unnecessary or Excessive Force

134.     Officers' conduct toward each TJ and Samari constituted excessive force, in violation of their rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

135.     Under the circumstances, officers' displays of force against and in the presence of young children was totally unnecessary, unreasonable and unjustifiable.

136.     Under the circumstances, officers' uses of force against K. Jackson and Terrance Jackson, Sr., undertaken in the presence of and witnessed by TJ and Samari, was totally unnecessary, unreasonable and unjustifiable.

137.     Officers failed to intervene to stop any use of force.

138.     Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to TJ and Samari's constitutional rights.

139.     Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

140.     The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of unnecessary force against and in the presence of TJ and Samari.

141.     As the direct and proximate result of officers' misconduct, plaintiffs TJ and Samari have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

142.     One or more officers had a reasonable opportunity to prevent or stop the violations of TJ and Samari's constitutional rights but stood by and failed to take any action.

143.     Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to TJ and Samari's constitutional rights.

144.     As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

145.     As the direct and proximate result of officers' misconduct, TJ and Samari suffered and continue to suffer injury and harm.

### COUNT II – UNLAWFUL SEARCH – INVALID WARRANT - 42 U. S. C. § 1983
**(Plaintiffs Bures, TJ, Samari, and J. Jackson)**

146.     Plaintiffs Bures, TJ, Samari, and J. Jackson re-allege paragraphs 1 – 116 above and incorporate them into this count.  They assert this claim against defendant officers and

any as yet unknown officers who participated in obtaining the search warrant for 7701 S. Paulina.

147.    Defendant officers unreasonably approved and/or obtained a search warrant for 7701 S. Paulina, the wrong address for Philip Baylis, a fact which invalidated the warrant from the start, prior to execution.

148.    Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

149.    As the sworn applicant for the warrant, officer Williams had an official duty to discover and disclose to the issuing magistrate whether he had identified the correct address or place to be searched and not the residence of an innocent third party.

150.    Officer Williams and the officers named in this count reasonably knew or should have known that the intended target(s) of the warrant did not reside at 7701 S. Paulina, basement unit, and that plaintiffs did.

151.    Officer Williams and the other officers had an official duty to reasonably investigate and verify information they received from the John Doe about where Mr. Baylis resided.

152.    Such an inquiry was easy to make.  Officer Williams and other officers had multiple sources of information available to them at the time, had they bothered to use them. They could have contacted the building's owner.  They could have contacted a utility company supplying energy to the building.  They could have utilized CPD's own information sources, such as Accurint, which assists officers in identifying apartments and the persons residing in them.  They could have conducted a LexisNexis search.

153.    However, on information and belief, officer Williams and others did not conduct any investigation or verification or failed to conduct a reasonable one.

154.    Consequently, in their complaint for search warrant defendant officers identified the wrong address, plaintiffs' address, a place they never had probable cause to enter and search.  Because officers utterly failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

155.    Lieutenant Cascone approved officer Williams' application for search warrant without ensuring that officer Williams and other officers had performed the due diligence required by CPD Special Order S04-19.

156.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

157.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent

158.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding and searching citizens' residence constituted an abuse of power and authority.  Defendant officers' actions – of relying solely on location information provided by a John Doe confidential informant who was a convicted felon with numerous prior arrests for handling and selling narcotics and not conducting their own investigation and surveillance to verify the address - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

159.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

160.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially TJ and Samari, defendants' conduct merits an award of punitive damages.

### COUNT III – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983 (All Plaintiffs)

161.    Plaintiffs TJ, Samari, Bures, K. Jackson, J. Jackson, and Blanchard re-allege paragraphs 1 – 116 above and incorporate them into this count.  All plaintiffs assert this claim against all defendant officers who entered and/or searched 7701 S. Paulina, basement unit.

162.    The manner in which officers conducted their entry into and search of plaintiffs' apartment were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

163.    For example, when these officers entered plaintiffs' apartment, they did not knock or announce themselves or their office in circumstances where it was required, they pointed guns at plaintiffs from close range, they handcuffed some plaintiffs without security concerns, they cursed and insulted and humiliated plaintiffs, they retaliated against plaintiffs when they asked to see a search warrant, and they intentionally damaged or destroyed plaintiffs' personal property, including TJ.'s birthday cake – all in front of the children.

164.    Further, it was unreasonable for officers to selectively detain K. Jackson, who did not pose a threat and who did not in any way resemble the target described in the search warrant.  Plaintiffs were detained out of retaliation, for an unreasonable length of time, and in an unreasonable and humiliating manner.

165.    Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

166.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

167.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

168.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking displays of force against a totally unarmed family with young children constituted an abuse of power and authority.  Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

169.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others, especially children.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

170.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially TJ and Samari, defendants' conduct merits an award of punitive damages.

## COUNT IV – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (Plaintiff K. Jackson)

171.    Plaintiffs K. Jackson re-alleges paragraphs 1 – 116 above and incorporates them into this count.  She asserts this claim against the defendant officer(s) who handcuffed her.

172.    Officers arrested and imprisoned plaintiff when, (a) without a warrant for her arrest and without probable cause to arrest her, they handcuffed and/or confined K. Jackson in the basement and brought her outside to stand in the cold.

173.    Officers' actions constituted a violation of plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

174.    When officers handcuffed and/or confined plaintiff, they unlawfully deprived her of their liberty to move about, despite the fact that she had not done nothing illegal and that officers had no probable cause for her arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

175.    One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiff's constitutional rights but stood by and failed to take any action.

176.    Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiff to a bounded area.

177.    Plaintiff was acutely aware of and were harmed by officers' confinement, as detailed above.  K. Jackson was extremely concerned about the children when officers separated her from them by taking her outside.

178.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiff's constitutional rights.

179.     As the direct and proximate result of officers' misconduct, plaintiff suffered and continues to suffer injury and harm.

## COUNT V – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (Plaintiffs Bures, TJ, Samari, and J. Jackson)

180.     Plaintiffs Bures, TJ, Samari, and J. Jackson incorporate paragraphs 1 – 116 above and assert this claim against defendant officers who participated in the search of plaintiffs' residence, basement unit.

181.     As set forth above, defendant officer unnecessarily and willfully converted, damaged or destroyed plaintiffs' real and personal property during the course of their search.  They damaged or destroyed Ms. J. Jackson's personal property and that of Ms. Bures, TJ, and Samari.  They intentionally did not return Ms. Bures' State of Illinois ID Card. Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for damage or destruction they caused. Defendant officers also intentionally damaged or destroyed plaintiffs' property out of spite.

182.     Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

183.     Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

184.     Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

185.     As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including emotional distress and financial harm.

### COUNT VI – ASSAULT – STATE LAW
### (All Plaintiffs except Bures and J. Jackson)

186.     Plaintiffs TJ, Samari, K. Jackson, and Blanchard re-allege and incorporate paragraphs 1 – 116 above in this count.  They assert this claim against defendant City of Chicago.

187.     The actions of officers set forth above, including pointing guns at close range at plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons.

188.     The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

189.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

190.     The conduct of defendant in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

191.     The Officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

192.     Plaintiffs have been seriously harmed by officers' actions.

## COUNT VII – BATTERY – STATE LAW
**(Plaintiff K. Jackson)**

193.    Plaintiff K. Jackson re-alleges and incorporates paragraphs 1 – 116 above into this count.  She asserts this claim against defendant City of Chicago.

194.    The actions of defendant officers set forth above, including handcuffing plaintiff, who was not a target of the search warrant, and intentionally tripping K. Jackson brought about harmful and offensive physical contacts to plaintiff's person.

195.    The officers intended to bring about harmful and offensive physical contact to plaintiff's persons.

196.    In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

197.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiff.

198.    The officers' actions were the direct and proximate cause of harmful and offensive physical contact to plaintiff's persons.

199.    Plaintiff was seriously harmed by officers' actions.

## COUNT VIII – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW
**(Plaintiff K. Jackson)**

200.    Plaintiff K. Jackson re-alleges paragraphs 1 – 116 above and incorporates them into this count.  Plaintiff asserts this claim against defendant City of Chicago.

201.    Officers arrested and imprisoned plaintiff when, (a) without a warrant for their arrest and without probable cause to arrest her, they (a) handcuffed and/or confined K. Jackson in the basement and brought her outside to stand in the cold.

202.    Officers' actions restrained plaintiff and confined her to bounded areas.

203.    Officers intended to restrain and confine plaintiff to bounded areas within or outside the house.

204.    In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

205.    The conduct of defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiff.

206.    Officers' actions caused the restraint and confinement of plaintiff to bounded areas within and outside the house.

207.     Plaintiff was harmed by officers' actions in restraining and confining them, as detailed above.

### COUNT IX - INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – STATE LAW
#### (Minor Plaintiffs TJ and Samari)

208.    Plaintiffs Terrance Jackson, Jr., and Samari Boswell re-allege and incorporate paragraphs 1 – 116 above in this count and assert this claim against defendant City of Chicago.

209.    The actions, omissions and conduct of officers set forth above were extreme and outrageous and exceeded all bounds of human decency.

210.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

211.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs, who were young children, were especially vulnerable and fragile.

212.    As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

213.    In the alternative, officers owed plaintiffs a duty of care that they breached when they pointed guns at them, pointed guns at their family members in their presence, handcuffed their father and aunt in front of them, poured hydrogen peroxide over TJ's birthday presents and destroyed TJ's birthday cake.  Plaintiffs are direct victims of officers' negligent infliction of emotional distress.

214.    In the alternative again, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

215.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have

occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

214. Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

## COUNT X - TRESPASS – STATE LAW
### (Plaintiffs Bures, TJ, Samari, J. Jackson)

215. Plaintiffs Bures, TJ, Samari, and J. Jackson re-allege paragraphs 1 – 116 above and incorporate them in this count. Plaintiffs assert this claim against defendant City of Chicago.

216. By obtaining and executing the search warrant when officers did not have probable cause to believe that the target resided at the address given them by the John Doe, officers physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

217. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

218. The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

219. Officers' actions caused a physical invasion of plaintiffs' residence.

220. Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT XI – *RESPONDEAT SUPERIOR* – STATE LAW *(All Plaintiffs)*

221. Plaintiffs re-allege paragraphs 1-116 and 186 – 220 above and incorporate them into this count. Plaintiffs assert this claim against defendant City of Chicago.

222. In committing the acts and omissions alleged above, officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

223. Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

### COUNT XII – INDEMNIFICATION – STATE LAW (All Plaintiffs)

224. Plaintiffs re-allege and incorporate paragraphs 1-116 and 186 – 220 above. Plaintiffs assert this count against defendant City of Chicago.

225. Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

226. Involved officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

### PRAYER FOR RELIEF (ALL COUNTS)

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a. Compensatory damages;

b. Punitive damages on counts II-V;

c. Reasonable attorney's fees and litigation costs and expenses; and

d. Such other or further relief as the Court deems just.

Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com


## JURY DEMAND

Plaintiffs demand trial by jury.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


s/Al Hofeld, Jr.
Al Hofeld, Jr.

<u>**NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**</u>

        I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on May 3, 2019, filing and service of the foregoing ***Amended Complaint*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com